1

2

3

4

5

6

7

8    IN THE UNITED STATES DISTRICT COURT

9    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   TRACY A. JOHNSON,

11          Petitioner,                    No. CIV S-09-1396 LKK DAD P

12      vs.

13   DERRAL G. ADAMS, Warden,

14          Respondent.                    <u>FINDINGS AND RECOMMENDATIONS</u>

15   _____/

16          Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas

17   corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2002 judgment of conviction

18   entered in the Sacramento County Superior Court on one count of second degree murder in

19   violation of California Penal Code § 187 (a)[1], enhanced by findings that petitioner personally

20   used a deadly and dangerous weapon in violation of § 12022 (b)(1) and inflicted corporal injury

21   on a co-habitant in violation of § 273.5.  Pursuant to that judgment, petitioner is serving a

22   sentence of sixty-three years to life in state prison.  He seeks federal habeas relief on the grounds

23   that: (1) the prosecutor's exclusion of two African-American prospective jurors violated his due

24   process rights under the decision in <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986); (2) testimony

25   _____

26       [1] All statutory references herein are to the California Penal Code unless otherwise noted.

1

1   concerning petitioner's prior acts of domestic violence was erroneously and prejudicially

2   admitted into evidence; (3) the improper admission of this domestic violence testimony violated

3   petitioner's right to the effective assistance of counsel; and (4) jury instruction error concerning

4   petitioner's prior acts of domestic violence violated his right to due process.  Upon careful

5   consideration of the record and the applicable law, the undersigned will recommend that

6   petitioner's application for habeas corpus relief be denied.

7   FACTUAL BACKGROUND

8        In an unpublished memorandum and opinion dated December 14, 2006, the

9   California Court of Appeal for the Third Appellate District set forth the operative facts with

10   respect to petitioner's offense of conviction and trial:

> A jury convicted Tracy Anthony Johnson of second degree murder
> and corporal injury on a cohabitant, and found that he personally
> used a dangerous weapon in committing the murder.  Finding that
> defendant had a prior conviction for domestic violence, had served
> two prior prison terms, and had four prior serious or violent felony
> strike convictions within the meaning of the "three strikes law," the
> trial court sentenced him to an aggregate prison term of 63 years to
> life.

* * *

> Late on the night of August 17, 1999, or early the next morning,
> defendant stabbed his girlfriend, Sharon Yates, 11 times.  One of
> the stabbings severed her carotid artery and killed her.

> At 5:30 a.m., defendant flagged down a police officer in downtown
> Sacramento and asked him to "[c]all somebody from homicide"
> because defendant "wanted to turn himself in."  When the
> homicide investigator arrived, defendant told him to send officers
> to his apartment, where they would find a dead body.  There, the
> officers discovered Yates's body on a blood-soaked bed with a
> pillow over her face. In addition to multiple stab wounds to her
> neck, Yates had defensive wounds on her elbow and right hand.  A
> knife blade was by her foot, and a knife handle was on the floor by
> the bed.  Defendant's fingerprints were on both the knife blade and
> the handle.

> Yates's sister, Shawnetta, who had been living with Yates and
> defendant, testified that a week or two prior to the killing,

26   /////

2

defendant threatened to do something crazy. FN1  The last time that Shawnetta saw Yates alive was around 10:30 p.m. on August 17, 1999.  Before Shawnetta went to sleep, she heard Yates say to defendant that he was "trippin."  Shawnetta did not hear any yelling, screaming, or loud noises of any sort that night.  She awakened the next morning to the sound of the police knocking on her door around 6:00 a.m.

FN1. Yates had four sisters, Sheila, Shirley, Shawn, and Shawnetta. For simplicity and to avoid confusion, we will refer to them by their first names.

Shawnetta's boyfriend, Donald Lipscomb, went to the apartment around 11:15 or 11:30 p.m. on the night of August 17.  Defendant answered the door, wearing only a pair of pants and sweating profusely.  Lipscomb asked, "What's up?"  Replying "I am just taking care of my business," defendant walked to the bedroom and shut the door.  Lipscomb, who did not hear any noises coming from the bedroom, changed his clothes and left the apartment.  According to Lipscomb, defendant had told him earlier in the day that the next person with whom defendant had a confrontation, "he was going to do something real bad to them" and "it wasn't going to be nice."

Three law enforcement officers testified concerning statements they had taken from Yates about defendant's prior physical abuse.

On March 6, 1996, Yates reported to police that after she had told defendant she wanted to end their relationship, he punched her, kicked her, and threatened to kill her.  Defendant was arrested about a week later, but was then released when Yates recanted her prior statement.

On December 28, 1996, defendant reported a residential burglary, claiming he came home and found that his girlfriend's clothing, some furniture, and a mattress had been cut.  According to defendant, his girlfriend, Yates, was missing, along with items of clothing and a typewriter.  Later that day, Yates telephoned the police, said she was not a missing person, and stated she had left the apartment in fear after having a "huge fight" with defendant, during which he threatened to kill her and also slashed the furniture because he was angry with her.

On June 16, 1998, Yates reported to the police that defendant had assaulted her the night before, and that she was afraid he was going to kill her.  Defendant had accused her of cheating on him and had made a threatening gesture with a necktie, indicating he was going to strangle her.  Later that night, Yates dragged her to the bedroom, pinned her down on the bed by her neck, and said he would "fuck her up."  He wrapped a belt around her neck, but she managed to

/////

3

insert a finger inside the belt, which allowed her to breathe until the belt eventually broke.

Yates's sisters, Sheila and Shawn, testified that in 1998, they saw Yates with bruises on her neck that were consistent with being choked with a belt. During that same year, they witnessed an incident in which defendant physically assaulted Yates. When the three sisters returned later than expected from an excursion in a car that defendant had rented, defendant argued with Yates. He broke the driver's side window of the car and punched Yates in the mouth, causing her tooth to pierce her lip.

Sheila and Shawn testified that defendant often threatened to kill Yates. Sheila urged Yates to leave him because there was too much violence in the relationship. Two weeks prior to the murder, Yates told Shawn that she was going to break up with defendant.

On August 16, shortly before Yates was murdered, Yates and defendant attended a family birthday party. There, the sisters reminisced about their mother and mentioned that she had been stabbed in the jugular vein and killed by Shawnetta's father.

On August 17, defendant was in a rage and looking for Yates. Sheila heard him say, in reference to Yates, that he was "sick of this B[itch]."

<u>Defense</u>

Defendant did not dispute killing Yates; he simply attempted to establish that he did so in a heat of passion, or in self-defense, or while he was in a dissociative state. FN2 He conceded that his relationship with Yates had been marred by domestic violence, but intimated that the degree of violence had been exaggerated by the prosecution. Defendant claimed the car rental incident referred to by Sheila and Shawn had occurred in 1996, not 1998, and since that time his relationship with Yates had been good up until the incident in June 1998.

FN2. At the sentencing hearing, however, defendant made the following statement to one of Yates's sisters: "Sheila, personally, I wouldn't give a fuck what you feel. You want to participate in lies and deception and manipulations, that if anybody would have been - I wish your bitch ass would have been there - because you would have got what she got."

With respect to the incident in June 1998, defendant denied choking Yates with a belt or threatening to kill her. He claimed that he just slapped her in the face because she took his car and left him with her children without asking him for use of the car. According to defendant, the only reason that he entered a plea of guilty to a misdemeanor for this incident was because he had been

4

arrested for felony spousal abuse, he had multiple prior convictions for robbery, and he wanted to avoid a possible "three strikes" life sentence.

A victim advocate for the district attorney's office testified Yates told her that defendant had not used the belt to choke her, only to get her attention. In addition, a neighbor who socialized with defendant and Yates testified they appeared to be a reasonably happy couple and she was not aware of any verbal or physical violence between them.

Defendant testified as follows. He denied telling Lipscomb that defendant was going to hurt anyone on August 17, 1999; he just said he would not tolerate the kind of condescending and patronizing treatment he had been receiving from someone at work. When defendant had arrived home around 11:30 p.m., he sat and talked with Yates for a while. He was not sweating profusely when Lipscomb arrived, and he did not mean anything by his comment about "handling [his] business." After he let Lipscomb in, defendant returned to the bedroom, and his conversation with Yates turned to their relationship. When the discussion became heated, she slapped his face. Because of anger management training he received in connection with his domestic violence conviction, defendant remained calm, but Yates's words became more mean-spirited and venomous. She called him a "bastard," which she knew was especially galling to defendant because his mother conceived him from a rape. She leaned forward and grabbed him, and he grabbed her back and attempted to push her onto the bed. When Yates then picked up a knife, defendant spontaneously grabbed the blade and a struggle ensued. Although defendant had no memory of stabbing Yates and placing a pillow over her face, he believed that he had stabbed and killed her. According to defendant, "I didn't mean to kill her." The next thing defendant remembered was driving around. He believed that he went to a friend's house. Defendant was in a daze and drove back to his apartment. When defendant saw Yates lying on the bed, he tried to go to the sheriff's department and a police station but both were locked. He waived down a police officer because he knew that law enforcement would want to talk to him, even though he did not know he had killed Yates.

Dr. Rob Woodman, a psychologist, testified that dissociative disorder is a partial or full inability to remember overwhelming or traumatic events. Presented with a hypothetical based on the facts of the case, Woodman opined the hypothetical was consistent with a dissociative state. However, because Woodman had not examined defendant, he did not know if defendant actually had experienced a dissociative state or whether he was lying.

/////

/////

5

<u>Rebuttal</u>

The detective who interviewed defendant for four hours on August 18, testified defendant never acknowledged that he used a knife during the assault.  Neither the detective nor another officer observed any injuries or cuts to the palm of defendant's hands, which one would have expected if defendant had grabbed the knife blade.

<u>Summation and Verdict</u>

During closing argument, defense counsel conceded there was no question that defendant killed Yates; the issue was whether the killing was murder or manslaughter.

By returning a verdict of second degree murder, the jury rejected the prosecution's theory of premeditated first degree murder and implicitly rejected defendant's theory of voluntary manslaughter.

(Notice of Lodging Documents on January 29, 2010, Resp't's Lod. Doc. 4 (hereinafter, "Opinion I") at 1-8.)

## PROCEDURAL BACKGROUND

On direct appeal petitioner raised various claims of error including a challenge, pursuant to the decision in <u>Batson v. Kentucky</u>, 476 U.S. 79, 96-98 (1986), to the prosecutor's use of peremptory challenges to exclude two African-American men, E.T. and J.W., from the jury panel.  (Notice of Lodging Documents on January 29, 2010, Resp't's Lod. Doc. 1.)  On December 14, 2006, the California Court of Appeal for the Third Appellate District, ruled against petitioner on each of the issues raised on appeal except one: his <u>Batson</u> challenge to the exclusion of juror J.W.  (Opinion I.)  On this issue the California Court of Appeal held that the trial court erred when, having found a prima facie case of discrimination as to both excluded black male prospective jurors, it only asked the prosecutor to give his reasons for challenging prospective juror E.T.  The state appellate court noted that rather than inquiring as to the prosecutor's reasons for excluding J.W., the trial court "impermissibly substituted its own reasons why it thought the challenge to J.W. was justified, without deciding whether those reasons actually and genuinely motivated the prosecutor's peremptory challenge."  (Opinion I at 13-17.)  Accordingly, the state

6

1  appellate court reversed the judgment and remanded the matter to the trial court

2         for the limited purpose of (1) requiring the prosecutor to explain
          his challenge to prospective juror J.W., and (2) then ruling on
3         defendant's Batson/Wheeler objection to that peremptory
          challenge.  If the trial court finds the challenge to J.W. was for a
4         race-neutral reason, it shall re-instate the judgment.  If it finds
          otherwise, the court shall grant defendant a new trial.
5

6  (Id. at 40-41.)

7         On January 22, 2007, petitioner filed a petition for review in the California

8  Supreme Court in which he took issue with the remedy ordered by the California Court of

9  Appeal, i.e., a remand for the limited purpose of determining prosecutorial intent as to

10  prospective juror J.W.  (Notice of Lodging Documents on January 29, 2010, Resp't Lod. Doc.

11  5.)  In that petition, he also challenged the state appellate court's rejection of the evidentiary and

12  jury instruction issues he had raised on appeal.  (Id.)  The California Supreme Court summarily

13  denied the petition for review on February 28, 2007.  (Notice of Lodging Documents on January

14  29, 2010, Resp't Lod. Doc. 6.)

15         On May 9, 2007, the Sacramento County Superior Court held a hearing pursuant

16  to the California Court of Appeal's remand of the Baston issue with respect to prospective juror

17  J.W.  (Reporter's Transcript of Proceedings, April 27, 2007 and May 9, 2007 (hereinafter "RT

18  Remand").)  At the conclusion of that hearing the trial court concluded that the prosecutor's use

19  of a peremptory challenge against J.W.  was genuinely motivated by a race-neutral reason and,

20  accordingly, reinstated the judgment of conviction against petitioner.  (Id. at 18-19.)

21         Petitioner appealed a second time, arguing that he was entitled to a new trial due

22  to Batson error as to prospective juror J.W. (Supplemental Notice of Lodging Documents on

23  November 17, 2010, Unpublished Opinion dated May 19, 2008, Third Appellate District Court

24  of Appeal (hereinafter "Opinion II").)  The state appellate court affirmed the judgment in a

25  reasoned opinion.  (Id.)  The parties aver that petitioner subsequently filed a second petition for

26  /////

1  review in the California Supreme Court, which was denied on August 13, 2008.[2] (Petition

2  (hereinafter, "Pet.") at 3; Mem. of P. & A., in Supp. of Answer at 2.)

3        The instant petition was filed on May 20, 2009.  (Doc. No. 1.)  In response to an

4  October 27, 2009 court order (Doc. No. 10), respondent filed an answer to the petition on

5  January 20, 2010 (Doc. No. 14).  Petitioner filed a traverse on March 30, 2010.  (Doc. No. 19.)

6  ANALYSIS

7  I.  <u>Standards of Review Applicable to Habeas Corpus Claims</u>

8        An application for a writ of habeas corpus by a person in custody under a

9  judgment of a state court can be granted only for violations of the Constitution or laws of the

10  United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the

11  interpretation or application of state law.  <u>See</u> <u>Wilson v. Corcoran</u>, 562 U.S.___, ___, 131 S. Ct.

12  13, 16 (2010); <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Park v. California</u>, 202 F.3d 1146,

13  1149 (9th Cir. 2000).

14        Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal

15  habeas corpus relief:

16        An application for a writ of habeas corpus on behalf of a
   person in custody pursuant to the judgment of a State court shall
17  not be granted with respect to any claim that was adjudicated on
   the merits in State court proceedings unless the adjudication of the
18  claim -

19        (1) resulted in a decision that was contrary to, or involved
   an unreasonable application of, clearly established Federal law, as
20  determined by the Supreme Court of the United States; or

21        (2) resulted in a decision that was based on an unreasonable
   determination of the facts in light of the evidence presented in the
22  State court proceeding.

23  _____

24    [2] Respondent's lodging of exhibits is incomplete, as it does not include any record of
   petitioner's second petition for review of the <u>Batson</u> issue presented herein filed in the California
25  Supreme Court.  Because respondent concedes that petitioner has exhausted all of his claims in
   state court, the undersigned has determined that the record is adequate to allow for resolution of
26  the petition without additional supplementing of the record.  However, counsel is advised that the
   court expects the lodging of a complete record.

8

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the state court decision.  Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  Nonetheless, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[3]  Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams, 529 U.S. at 412.  See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v. Richter, 562 U.S.___,___,131 S. Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for

---

[3]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding."  Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

9

1   obtaining habeas corpus from a federal court, a state prisoner must show that the state court's

2   ruling on the claim being presented in federal court was so lacking in justification that there was

3   an error well understood and comprehended in existing law beyond any possibility for fairminded

4   disagreement." Harrington,131 S. Ct. at 786-87.

5       If the state court's decision does not meet the criteria set forth in § 2254(d), a

6   reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v.

7   Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th

8   Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because

9   of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

10  considering de novo the constitutional issues raised.").

11      The court looks to the last reasoned state court decision as the basis for the state

12  court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

13  2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning

14  from a previous state court decision, this court may consider both decisions to ascertain the

15  reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en

16  banc). "When a federal claim has been presented to a state court and the state court has denied

17  relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

18  of any indication or state-law procedural principles to the contrary." Harrington, 131 S. Ct. at

19  784-85. This presumption may be overcome by a showing "there is reason to think some other

20  explanation for the state court's decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker,

21  501 U.S. 797, 803 (1991)). Where the state court reaches a decision on the merits but provides

22  no reasoning to support its conclusion, a federal habeas court independently reviews the record to

23  determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860;

24  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is

25  not de novo review of the constitutional issue, but rather, the only method by which we can

26  determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at

10

853.  Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief."  Harrington, 131 S. Ct. at 784.

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

II.  Petitioner's Claims

    A.  Batson challenges

Petitioner claims that Batson error occurred when the prosecutor exercised peremptory challenges to exclude two African-African males, , E.T. and J.W. , during jury voir dire (Pet. at 7-8.)  As described above, the California Court of Appeal resolved petitioner's Batson challenges to the prosecutor's use of peremptory challenges in two separate opinions, each subject to AEDPA review.  Below, the court addresses petitioner's Batson claims as to each of the prospective jurors in turn.

        1.  State Court Opinion - E.T.

The last reasoned decision to address petitioner's Batson challenge to the prosecutor's exclusion of prospective juror E.T. from the jury panel was the California Court of Appeal's opinion dated December 14, 2006 (Opinion I).  Therein, the state appellate court held that the trial court did not err in finding the prosecutor's stated reasons for excluding E.T. to be "genuine and legally sufficient."  (Opinion I at 13.)  Those reasons included the fact that E.T. was the only juror who indicated in the juror questionnaire that he did not want to be there and that his body language made the prosecutor "feel uncomfortable" with having him on the jury.  (Id. at 11-13.)  With respect to the exclusion of prospective juror E.T., the state appellate court reasoned:

Here, defense counsel made a Wheeler/Batson motion after the prosecutor exercised peremptory challenges against prospective jurors J.W. and E.T., two African-American men on the panel.

When defense counsel began to explain why he believed there was a likelihood those prospective jurors were excluded because of their "group status," the trial court interrupted, stating: "I will save you some time. [¶]  On the face, you have made a prima facie challenge, and my understanding is the burden is now on the prosecutor to offer some articulatable [sic] reason, if he can, as to why you have excused those two jurors, other than for their racial or ethnic characteristic."

The prosecutor disputed that defendant had shown a prima facie case of discrimination, pointing out there were two African-American women in the jury box.  Nonetheless, the court reiterated its finding that a prima facie case had been made and asked the prosecutor: "Why did you excuse [E.T.]?"  The court did not, either at this time or later, ask the prosecutor to comment on his challenge to J.W.

Noting that, in the juror questionnaire, E.T. stated he did not want to be a juror and that E.T. was the only prospective juror in the jury box who had answered in this manner, the prosecutor pointed out that during voir dire, E.T. indicated he was willing to go into his savings to meet his financial obligations in order to serve on the jury.  These "conflicting" responses and E.T.'s "body language" made the prosecutor "feel uncomfortable with having him as [a] juror in this case."

Without asking the prosecutor why he excused J.W., the court denied the Wheeler/Batson motion, finding that there was no "pattern" of discrimination and that race-neutral reasons existed to exclude J.W. and E.T.  The court explained:

"I will find that as to [J.W.], that his responses . . . about his litigation with his employer,  . . . his brother's prior criminal history and the like, and his description of the . . . negative encounter with law enforcement related to a traffic stop, appear on the face to be adequate reasons to dismiss him from jury service."

"With respect to [E.T.], I had not noticed that . . . he's the only one that indicated on his questionnaire he did not wish to be here." Although E.T. "did offer some information on the record conflicting to that," "in light of [his] written response that he did not wish to be here, that is, he apparently being the only juror to so note in his jury survey, I think that that in itself causes a litigant, the People or otherwise, to be suspect of [his] commitment to serve on a jury."

* * *

12

1          Defendant contends that although the trial court found the prosecutor's stated reason for excluding E.T. was objectively valid, the court neglected to make the requisite assessment of the prosecutor's subjective good faith, i.e., that the reason stated by the prosecutor actually motivated the peremptory challenge and was not simply a sham excuse contrived to avoid admitting an act of discrimination.  (People v. Reynoso, supra, 31 Cal.4th at p. 924 ["The proper focus of a Batson/Wheeler inquiry, of course, is on the subjective genuineness of the race-neutral reasons given for the peremptory challenge, not on the objective reasonableness of those reasons"].)

       In defendant's view, the record indicates that the trial court did not understand its duty to determine the subjective genuineness of the prosecutor's reason for challenging prospective juror E.T.  To support this suggestion, defendant notes the court characterized as objectively articulable the "adequate reasons" that the court had earlier identified for the challenge to J.W.

       **However, with respect to the prosecutor's challenge to E.T., the trial court examined the reasons given by the prosecutor and found they were sufficient to cause a litigant, including the prosecutor, to suspect E.T.'s commitment to serve on the jury. This demonstrates that the court found the prosecutor's reasons for challenging E.T. were both genuine and legally sufficient.  There was no error in this regard.**

(Id. at 11-13) (emphasis added).[4]

       2.  State Court Opinion - J.W.

       As noted above, in its first opinion in this matter in 2006, the California Court of Appeal remanded the matter to the trial court "for the limited purpose of (1) requiring the prosecutor to explain his challenge to prospective juror J.W., and (2) then ruling on defendant's Batson/Wheeler objection to that peremptory challenge."  (Opinion I at 40.)  Following remand, petitioner again appealed.  Thus, the last reasoned state court decision addressing the prosecutor's use of a peremptory challenge to exclude prospective juror J.W. is the state

---

    [4]  This  excerpt from the state appellate court's opinion is also relevant to the exclusion of prospective juror J.W., discussed below.  The undersigned has not included in these findings and recommendations those portions of the state appellate court's 2006 opinion explaining why petitioner's Batson challenge as to prospective juror J.W. warranted remand, since the last reasoned state court decision regarding the prosecutor's use of a peremptory challenge to exclude prospective juror J.W. was issued in 2008, following the remand.

appellate court's second opinion issued in 2008 (Opinion II).  In that latter opinion, the California

Court of Appeal described the proceedings on remand as follows:

> At the hearing on remand, the prosecutor explained his reasons for excusing J.W. and the bases for his recollection of them:
>
> "This trial was very memorabl[e] to me.
>
> "It was my first homicide trial.  I think that should be note[d] on the record.  Even though it's five years ago, I have a very distinct memory of it.
>
> "I pulled my file on this case back when the appeal was granted, and contained within my file w[ere] my juror notes, including the original form the Court provided, as well as the individual post-its.
>
> "It's my procedure and practice as jurors are excused, to keep the post-it on the location where that juror was seated, as well as to indicate on my notes which juror was excused in which order.
>
> "I was very easily able to look at these notes and determine Mr. W[.], who is seated in seat seven, as well as looking back at Mr. T [ .], who was in seat nine, and recalculate each of the jurors that were dismissed.
>
> "I would note there w[ere] only four jurors dismissed."
>
> "This case was memorabl[e] for me in, not only in regards to being the first homicide that I tried, but also in regards to the number of jurors."
>
> "I have distinct recollections of each of these, not each of them, but many of the jurors."
>
> "I remember L[.]G[.] being on the jury.
>
> "I remember Mr. P[.] for his background in relation to being raised in Germany and fighting in World War Two.
>
> "And I do specifically remember Mr. W[.], because I remember he was the second challenge that I used.
>
> "I note that on my original post-it, indications that he was unemployed, suing his employer for unlawful termination, that he had two brothers incarcerated, one brother took a deal.
>
> "I distinctly recall Mr. W[.] indicating that his brother, one of his brothers that was in prison, involved the death of a nephew [sic] and was killed.

/////

14

"And I remember at the time being very troubled by that, in light of the fact this was a homicide case, as well as the fact of the suing of his employer, his negative police encounters, that he had indicated, I believed he came across as a very, almost bitter individual, is my recollection of him, and someone that I did not want on the jury.

"I remember a lot of the information we got from Mr. W[.] came through his questionnaire, and I think the Court, I noted originally on his questionnaire, indicated he was Caucasian at the top of his questionnaire versus African American.

"This case also is very important to note, I believe the victim in this case was African American.  The Defendant was African American also."

"I think it's also important to note there w[ere] only four jurors, maybe five jurors[,] excused by the People, out of 20 peremptory challenges, and that two African Americans remained on the jury of 12 individuals.

**"I excused Mr. W[.] for the reasons that I have just articulated, the fact that he was unemployed, brothers were incarcerated, the fact that he appeared bitter in court, the suing of his employer, as well as negative encounters with law enforcement.**

"Each of those individual reasons, as well as all the reasons combined, were my basis for excusing Mr. W[.], and I believe that the challenge was appropriate.  I would do it again today."

In response, defense counsel renewed his argument that fundamental fairness required a new trial because (1) five years since the original voir dire, the prosecution "cannot fairly reconstruct the subjectively genuine reasonably specific race or group neutral reasons which actually genuinely motivated the prosecutor's peremptory challenge"; and (2) this court's opinion in Johnson I effectively "g[a]ve a script to the prosecutor" to use in articulating racially neutral reasons for excusing J.W.

The court found that the prosecutor excused potential juror J.W. for race-neutral reasons:

"This Court recalls distinctly the trial of the matter.

"Having read the Court of Appeal's opinion, which contains this Judge's quotes on page 12 as to the reasons this Judge felt that J.W. had been adequately or properly dismissed, this Judge now, and has previously recalled specifically, and now with more specificity, the reasons why juror J.W. was excused.

"The Court of Appeal's opinion notes that this hearing today probably is an elevating [of] form over substance, because when

E.T. was excused, and the Court accepted race[-]neutral reasons for E.T.'s excusal, this Court went on to state race[-]neutral reasons for J.W.'s excusal, which are essentially, in many ways, the same reasons offered by the prosecutor, which on their face are race neutral.

"This Judge went out of the way at the time of jury selection, to insure and be satisfied that J.W. had not been excused for racial reasons.

"This Judge was satisfied at the time, offered the comments on the record to explain to the Court of Appeal and to the jury panel and to you, Mr. Johnson, and your lawyer, why I felt there had been no discriminatory intent, or inference of discriminatory intent, and denied the Batson[/]Wheeler motion.

"Having heard the prosecutor's reasons which were never previously stated on the record, which have now been stated on the record, the Court does find that the excusal of J.W. was for race[-]neutral reasons, that there was no inference of discrimination, no pattern, no discrimination following the excusal of J.W. or E.T. or of both of those jurors in combination.

"And having found and accepted the race[-]neutral explanation by the prosecutor, reinstates the judgment, denies any requests for a new trial, and rejects any claim of denial of due process.

"The Court finds specifically that the passage of time has not inured to the defendant's prejudice as the record has been well preserved."

(Opinion II at 6-9) (emphasis added.)

The California Court of Appeal subsequently affirmed this determination by the trial judge that the prosecutor's reasons for excluding prospective juror J.W. were in fact race-neutral, reasoning as follows:

The arguments presented by defendant in this appeal do not convince us that the trial court's evaluation of the prosecutor's credibility was clearly erroneous. (Cf. Snyder v. Louisiana, supra, 552 U.S. at ---- [170 L.Ed.2d at 181].) Defendant asserts other jurors allowed to remain on the panel had at least one of the circumstances present for J.W. For example, one juror had a grandson who had been in juvenile hall on a robbery charge; another had been in and out of the court system for an auto theft. Although defendant suggests that those jurors' family experiences with the justice system are no different from the criminal records of J.W.'s brothers, he is mistaken: the prosecutor told the trial court

16

he was particularly concerned because one of J.W.'s brothers had been involved in a homicide case - a case involving the very charge at issue here.  None of the jurors remaining on the panel had family members convicted in a homicide case.

Similarly, defendant suggests the trial court should have disbelieved the prosecutor's stated reasons for excusing Juror J.W. because another juror's wife had experienced a dispute with her employer, but had resolved it prior to initiating litigation.  This fact does nothing to undermine the prosecutor's explanation that he considered J.W.'s own litigation with his employer to be a factor against keeping him on the jury.  Nor does it undermine the prosecutor's assertion that he weighed J.W.'s employment litigation together with the other negative considerations, such as his brothers' incarceration, had what he perceived to be negative encounters with law enforcement, and appeared to be a "bitter" individual.

Defendant has provided no justification for us to reject the trial court's conclusion that the reasons given by the prosecutor for challenging J.W. truly motivated his decision and were not sham excuses designed to hide discriminatory motives.  Thus, defendant has not shown that the Wheeler/Batson hearing conducted on remand deprived him of due process or that a new trial was otherwise required.

The judgment is affirmed.

(Opinion II at 11-13.)

### 3.  Legal Standard

The Supreme Court has established a three-part test to determine if a prosecutor has discriminated in excluding prospective jurors.  Batson, 476 U.S. at 96-98.  First, the defendant must make a prima facie showing that the challenge was based on race.  Second, the prosecutor must offer a race-neutral basis for the challenge.  Third, the court must determine whether the defendant has shown "purposeful discrimination."  Id.

The Ninth Circuit recently set forth a detailed explanation of the three-step Batson inquiry:

Under Batson's first step, the defendant must establish a prima facie case of purposeful discrimination.  See Batson, 476 U.S. at 93-94, 106 S.Ct. 1712.  He must show that (1) the prospective juror is a member of a "cognizable racial group," (2) the prosecutor used a peremptory strike to remove the juror and (3) the totality of the

17

circumstances raises an inference that the strike was on account of race.  Id. at 96, 106 S.Ct. 1712; see Johnson [v. California, 545 U.S. 162, 169 (2005)]; Boyd v. Newland, 467 F.3d 1139, 1143 (9th Cir. 2006).

* * *

After the opponent of the peremptory strike makes a prima facie case raising an inference of discrimination, "the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two)."  Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769 (1995).  The explanation does not have to be "persuasive, or even plausible," because "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."  Id. at 768, 115 S.Ct. 1769.  As we explained in Yee v. Duncan:

> [S]tep two is an opportunity for the prosecution to explain the real reason for her actions. A failure to satisfy this burden to produce - for whatever reason - becomes evidence that is added to the inference of discrimination raised by the prima facie showing, but it does not end the inquiry. The trial court then moves on to step three where it considers all the evidence to determine whether the actual reason for the strike violated the defendant's equal protection rights.

463 F.3d 893, 899 (9th Cir. 2006).

* * *

In step three of the Batson inquiry, the court must decide whether the opponent of the peremptory challenge has carried his burden of proving purposeful discrimination by a preponderance of the evidence.  See Batson, 476 U.S. at 98, 106 S.Ct. 1712; Cook v. LaMarque, 593 F.3d at 815 (to show "purposeful discrimination at Batson's third step" petitioner must establish that "race was a substantial motivating factor").

Crittenden v. Ayers, 624 F.3d 943, 955, 957-58 (9th Cir. 2010).

Under the AEPA standard of review, a federal habeas court may grant relief only if it finds that the state court made "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Rice v. Collins, 546 U.S. 333, 338-39 (2006). See also Stanley, 633 F.3d at 859 (Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in

18

1   light of the evidence presented in the state court proceeding."); Davis, 384 F.3d at 638.   As the

2   Supreme Court has stated:

> 3   Thus, a federal habeas court can only grant [the] petition if it was
>     unreasonable to credit the prosecutor's race-neutral explanation for
> 4   the Batson challenge.  State-court factual findings, moreover, are
>     presumed correct; the petitioner has the burden of rebutting the
> 5   presumption by "clear and convincing evidence."

6   Rice, 546 U.S. at 338-39 (quoting 28 U.S.C. § 2254(e)(1)).  See also Miller-El v. Dretke, 545

7   U.S. 231, 240 (2005); Cook v. LaMarque, 593 F.3d 810, 815 (9th Cir. 2010) ("We review the

8   state court's finding that the prosecutor did not engage in purposeful discrimination under the

9   deferential standard of the [AEDPA]"); Yee v. Duncan, 463 F.3d 893, 898 (9th Cir. 2006)

10   (petitioner's burden to prove purposeful discrimination).  Moreover, in reviewing Batson

11   challenges, federal habeas courts have been cautioned as follows: "Reasonable minds reviewing

12   the record may disagree about the prosecutor's credibility, but on habeas review that does not

13   suffice to supersede the trial court's credibility determination."  Rice, 546 U.S. at 341-42.  See

14   also Cook, 593 F.3d at 815 (factual finding by state trial court of prosecutor's state of mind in

15   exercising challenges based on demeanor and credibility are entitled to deference); Lewis v.

16   Lewis, 321 F.3d 824, 830 (9th Cir. 2003) (finding regarding discriminatory intent turns largely

17   on the court's evaluation of the prosecutor's credibility and thus "the court's own observations

18   are of paramount importance")

19          4.  Discussion

20          Under the authorities discussed above, the only issue for review by this federal

21   habeas court is whether the state courts were reasonable in determining that the prosecutor's

22   stated race-netural reasons for excluding E.T. and J.W. were genuine.  Having reviewed the

23   record, and in light of the governing deferential standard of review, the undersigned concludes

24   the state court's determination that the reasons given by the prosecutor for excluding these two

25   prospective jurors were not a pretext for racial discrimination cannot be found unreasonable.

26   /////

1    Jurors E.T. and J.W. were the only two African-American males in the jury pool

2    at petitioner's trial.  (Augmented Reporter's Transcript on Appeal (hereinafter "ART") at 266.)

3    Both were the subject of peremptory challenges by the prosecutor; however, the jury selected and

4    seated to hear petitioner's case did include two African-American women.  (Id. at 266-67.)[5]

5                                          a.  <u>E.T.</u>

6    Prospective juror E.T. identified himself as a respiratory therapist and veteran,

7    discharged from military service in 1965.  (ART at 195-196.)  On the jury questionnaire, E.T.

8    responded to the question "Did your previous jury influence the way you look at the criminal

9    justice system?" as follows: "I never had any experience with the criminal justice system, <u>and I</u>

10   <u>really don't want to be here</u>."  (ART at 270-71) (emphasis added).  However, during voir dire,

11   when defense counsel asked E.T. if he was willing to serve on the jury, he answered "Yes."  (<u>Id.</u>

12   at 216, 270-71.)

13   The prosecutor's questioning of E.T. during voir dire began as follows:

14           Q: I noticed on your questionnaire also, that it indicated you were
             not getting paid for jury service; is that correct?
15

16           A: Correct.

17           Q: And does that provide any difficulty for you and your family at
             this point?

18           A: Well this is my family so --

19           Q: Okay.

20           A. – I will have to probably go into my savings but, unless this is
             going to last for a month or so, it's not going to be a problem.
21

22   /////

23   _____

24       [5]  The fact that the jury included minorities may be considered indicative, but not
     dispositive, of a nondiscriminatory motive on the part of the prosecutor in the exercise of
25   peremptory challenges.  <u>United States v. Cruz-Escoto</u>, 476 F.3d 1081, 1090 (9th Cir. 2007);
     <u>Cooperwood v. Cambra</u>, 245 F.3d 1042, 1048 (9th Cir. 2001); <u>Turner v. Marshall</u>, 121 F.3d
26   1248, 1254 (9th Cir. 1997), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Tolbert v. Page</u>, 182 F.3d 677 (9th
     Cir. 1999) (en banc).

                                                 20

Q: This is scheduled to last somewhere between three weeks to four weeks is our prediction at this time.  Are you saying that you're not going to get paid for any of that time?

A: I understand we get paid for three days and that's it.

Q: Okay.

A: 90 percent of this is not going to be paid for.

Q: We appreciate your community service.  But is that going to be weighing on your mind as you sit there as a juror, thinking I could be earning X amount of dollars per hour at work, and it's going to affect whether I can pay my rent or pay my bills?

A: It's going to last for like two minutes, and you just brought it up.  So if it's going to happen, so I am not going to worry about it.

Q: If it is something that is going to happen, that is something the Court can consider as a hardship for you if you say it's something that would be weighing on your mind.  If not, that's fine.

A: It's not going to be on my mind . . . [W]hy worry about it.  That's the way I am.

Q: Okay.  And you feel that you will have to go into your savings, though, in order to --

A: Yeah, I will.  Yeah, I have a car.  I have rent to pay.  Those are the only two things that I am really worried about.

* * *

Q: And do you have adequate savings to cover those sort of things without prying into your financial --

THE COURT:  Mr. Ore, he responded he's not worried about it.

(Id. at 235-237.)

When later asked by the trial judge why he excluded prospective juror E.T., the prosecutor responded:

Mr. Terrell indicated specifically that he did not want to be here in his jury questionnaire. . . . Every other juror that is currently in this box has indicated either, yes, they do want to be here, or, no, they have no opinion.  Mr Terrell, in addition to that, is not getting paid here.  And when I indicated, how does he feel about that, he indicated that he would have to go into his savings.  He indicated that . . . he would have to be worried about his rent and his car

21

1
2
3
4
5

> payment . . . . I have a very difficult time when taking into account his body language, the way he was responding to those questions, when he indicates that, one, he doesn't want to be here, yet; two, he's not getting paid . . . . When you take all those things into consideration, with his body language, the way he answered my specific questions regarding money, it provided some conflict in my mind, and makes me feel uncomfortable with having him as a juror in this case.

6   (Reporter's Transcript on Appeal (hereinafter "RT") at 54-55.)

7           This statement by the prosecutor in explaining his reason for the exercise of his

8   peremptory challenge arguably mischaracterizes E.T's statements regarding financial hardship.

9   Although the prosecutor repeatedly invited E.T. to express concern that jury service would make

10  it difficult for him to meet his financial obligations, E.T. indicated several times that he was not

11  particularly concerned about the issue, stating: "It's not going to be a problem"; any such worry

12  "is going to last like two minutes"; "I am not going to worry about it"; "It's not going to be on

13  my mind . . . [W]hy worry about it."  (ART at 235-37.)  The court is mindful that absent "clear

14  and convincing evidence" that the state court erroneously credited the prosecutor's stated reason

15  for excluding E.T., this habeas court must defer to the state court's findings.

16          Here, the prosecutor stated that he was concerned about E.T's response on the

17  juror questionnaire that he did not want to there along with E.T. body language in responding to

18  the prosecutor's questioning during voir dire.  As the Ninth Circuit has observed,

19
20
21
22
23

> Excluding jurors because of their profession, or because they acquitted in a prior case, or because of a poor attitude in answer to voir dire questions is wholly within the prosecutor's prerogative.  See United States v. Vaccaro, 816 F.2d 443, 457 (9th Cir. 1987) (poor attitude).  Such reasons may not be logical, but that's what peremptory challenges are all about.  They are often founded on nothing more than a trial lawyer's instinct about a prospective juror.

24  United States v. Thompson, 827 F.2d 1254, 1260 (9th Cir. 1987).  See also Purkett v. Elem, 514

25  U.S. 765, 769 (1995) ("The prosecutor's proferred explanation in this case - that he struck juror

26  number 22 because he had long, unkept hair, a mustache, and a beard - is race neutral and

1  satisfies the prosecution's . . . burden of articulating a nondiscriminatory reason for the strike.");

2  Boyde v. Brown, 404 F.3d 1159, 1170 (9th Cir. 2005) (prosecutor's reasons for exercising a

3  peremptory challenge due to the prospective juror's "grandmotherliness, her hesitations, her

4  'transient' background and her 'persona'" were all "plainly race-neutral"); Harrod v. Scribner,

5  No. 08-56203, 2010 WL 3314499, at *1 (9th Cir. Aug. 24, 2010)[6] ("A prosecutor may

6  legitimately dismiss a juror for "poor attitude."). Certainly a prospective juror's indication that

7  he is reluctant to participate in jury duty is a legitimate, race-neutral explanation for the exercise

8  of a peremptory challenge.

9      It is also true that prospective juror E.T. indicated in writing that he was reluctant

10  to serve on the jury. Most importantly, the trial court judge contemporaneously found that, "in

11  light of [E.T.'s] written response that he did not wish to be here, . . . I think that in itself causes a

12  litigant, the People or otherwise, to be suspect of a juror's commitment to serve on a jury. He did

13  offer some information in the record conflicting to that. However, . . . I don't note a pattern at

14  this point." (RT at 58.) On appellate review the California Court of Appeal found the trial

15  court's reasoning to be legally sufficient. (Opinion I at 13.)

16      The undersigned finds this to be a somewhat close question. It is true that

17  prospective juror E.T. stated on his juror questionnaire that he "really didn't want to be there"

18  presumably in referring to jury service. However, upon questioning by the prosecutor, E.T.

19  indicated his willingness to serve and that he wasn't going to worry about any financial hardship

20  caused by his service. The prosecutor later stated that he challenged E.T. in part because of his

21  body language and the way he responded to those questions. Yet a fair reading of the cold record

22  is that the trial judge found E.T.'s responses to be appropriate and the prosecutor's dwelling on

23  the subject of E.T.'s finances to be arguably inappropriate. See RT at 237 ("Mr. Ore, he

24  responded he's not worried about it.") Thus, one may be left with E.T.'s answer on the

25

26      [6] Citation to this unpublished decision is appropriate pursuant to Ninth Circuit Rule 36-3(b).

1  questionnaire that "I don't really want to be here" as the only legitimate race-neutral reason given

2  by the prosecutor for his use of a peremptory challenge against E.T.  Yet, with little discussion on

3  the record as to the reasons why, it was an explanation that the trial judge found to be credible.

4  (RT at 58.)

5        Despite the undersigned's concerns, under AEDPA this court must give

6  considerable deference to the trial court's firsthand observation of the demeanor of both E.T. and

7  that of the prosecutor in explaining his reason for the challenge, as well as to the state court's

8  decision.  Here, the trial judge found the prosecutor's race-neutral explanation to be credible.

9  While "[r]easonable minds reviewing the record may disagree about the prosecutor's credibility,"

10  on habeas review that does not suffice to supercede the trial court's credibility determination.

11  Rice, 546 U.S. at 342.  Therefore, the undersigned concludes that petitioner is not entitled to

12  federal habeas relief with respect to his Batson claim as to prospective juror E.T.

13                    b.  J.W.

14        As a preliminary matter, the court addresses petitioner's argument that the five-

15  year lapse of time between voir dire in April 2002 and the Batson remand hearing as to juror

16  J.W. in May 2007 violated his right to due process because the prosecutor's frame of mind could

17  not be meaningfully reconstructed.  (Reply at 1-2; see also Opinion I at 17-18 (noting that this

18  issue "could be addressed by the trial court on remand . . ., bearing in mind that there is a court

19  reporter's transcript of the voir dire and challenges.").)  At the hearing following remand, the

20  state trial court rejected this due process argument, finding "specifically that the passage of time

21  has not inured to the defendant's prejudice as the record has been well preserved."  (RT Remand

22  at 18-19.)  The state appellate court subsequently held that petitioner had not shown this ruling to

23  be erroneous.  (Opinion II at 11.)

24        Certainly there are cases where the passage of time may impair the trial court's

25  ability to make a reasoned determination of the prosecutor's state of mind when the jury was

26  selected.  Where such impairment demonstrably exists, there must be a new trial.  United States

v. Alcantar, 897 F.2d 436, 438-439 (9th Cir. 1990) ("If the passage of time has rendered such a hearing meaningless for [Batson]'s purpose, the conviction must be vacated and a new trial scheduled.") (citing Thompson, 827 F.2d at 1262); see also Haney v. Adams, ___F.3d___, 2011 WL 2040962, at *3 (9th Cir. May 26, 2011) (discussing this concern in the context of explaining the contemporaneous objection requirement under Batson).  However, having reviewed the record in this particular case, the undersigned agrees that petitioner was not prejudiced by the lapse of time in question.

Here, the record reflects that the prosecutor was able to reconstruct, in detail, his concerns regarding prospective juror J.W. with the aid of his case file which even included Post-It notes about individual jurors and the original juror questionnaires, as well as the reporter's transcript of both voir dire and objections to the exercise of challenges.  (RT Remand at 10-13.)  Moreover, the prosecutor stated at the hearing following remand that he "specifically remember[ed]" prospective juror J.W. because it was the prosecutor's first homicide trial and J.W. was only the second peremptory challenge he exercised.  (Id. at 12.)  Similarly, the trial judge stated at the remand hearing that he "recalls distinctly the trial of this matter," including "the reasons why juror J.W. was excused."  (Id. at 17.)  Thus, the undersigned is satisfied that the state trial court in this case was able make a reasoned Batson determination despite the passage of time.

Turning to the merits of this claim, the record reflects that prospective juror J.W. identified himself during voir dire as unemployed and currently suing his former employer for wrongful termination.  (ART at 232.)  He stated that one of his brothers was arrested for "stealing stereos out of cars" and that another brother had served seven years for killing his nephew in car accident.  (Id. at 232-233.)  Regarding his encounters with law enforcement, prospective juror J.W. stated that one of his friends was a prison worker who had inappropriately used his badge to get out of speeding tickets.  (Id. at 232-33.)  He also described an experience six years earlier in which a police officer pulled him over and informed him that he didn't have a current registration

1  sticker on his car.  J.W. reported replying that the sticker was on the car, and the officer asked:

2  "[A]re you calling me a liar?"  J.W. stated that he had put the sticker on the car the previous

3  week.  The officer told him to get out of the car and look, and J.W. did so, saw that someone had

4  removed the sticker, and apologized to the officer.  (Id. at 234.)

5          On remand, the prosecutor explained that he excused prospective juror J.W. due

6  to "the fact that he was unemployed, brothers were incarcerated, the fact that he appeared bitter

7  in court, the suing of his employer, as well as negative encounters with law enforcement."  (RT

8  Remand at 13.)  At the remand hearing, the trial judge stated that he "went out of his way at the

9  time of jury selection, to insure and be satisfied that J.W. had not been excused for racial

10  reasons," and that, on remand, he "accepted the race neutral explanation by the prosecutor."  (Id.

11  at 18.)  On review, the California Court of Appeal concluded that a comparative analysis of

12  prospective juror J.W. and those jurors allowed to remain on the panel did not suggest the

13  prosecutor's stated reasons for excusing prospective juror J.W. were pretextual.  (Opinion II at

14  11-12.)  The state appellate court noted that J.W. was the only prospective juror who had a family

15  member convicted of homicide, the charge at issue in this case, and that non-black jurors allowed

16  to remain on the panel were thus not comparable to J.W. in this regard as argued by the defense.

17  (Id.)  The court also observed that a juror whose wife had experienced a dispute with her

18  employer, and was allowed to remain on the panel, was not comparable to prospective juror J.W.

19  The state appellate court found no reason to doubt the prosecutor's stated reasons that J.W. had

20  negative encounters with police and appeared "bitter."  (Id.)

21          This is not as close of a question as posed by the exclusion of prospective juror

22  E.T.  Having reviewed the record, the undersigned cannot find under the deferential AEDPA

23  standard that the state trial court's credibility determination with respect to the race-neutral

24  explanation given by the prosecutor for challenging  prospective juror J.W.  was unreasonable.

25  Petitioner argues that the prosecutor offered no credible explanation why prospective juror J.W.

26  was situated differently than Juror No. 12, whose grandson had been in juvenile hall on robbery

1    charges.  (Reply at 2; see ART at 130.)  However, as described above, the state appellate court

2    reasonably addressed and rejected this argument after conducting a comparative analysis.  See

3    Cook, 593 F.3d at 817-21 (comparative juror analysis supported the credibility of the

4    prosecutor's explanation for the exercise of peremptory challenges); Mitleider v. Hall, 391 F.3d

5    1039, 1051 (9th Cir. 2004) (same).  Similarly, the California Court of Appeal reasonably

6    addressed petitioner's claim that prospective juror J.W. was no less an attractive juror than Juror

7    No. 6, whose wife had retained a lawyer for a work-related dispute.  (Id., see ART at 153-154.)

8    In this regard, there is nothing suspect about the fact that the prosecutor was more concerned

9    about the activities of J.W. than the activities of Juror No. 6's wife, who would in no event be a

10   juror in the case.  Petitioner also argues that J.W.'s encounters with law enforcement were not as

11   negative as the prosecutor suggested. (Reply at 2.)  Even if so, this alone would not suffice to

12   show that the prosecutor's combined reasons for excluding J.W. were a pretext for

13   discrimination.  See Cook, 593 F.3d at 826 (even if some of the reasons given by the prosecutor

14   were unpersuasive, where "the most significant justifications in each instance were entirely

15   sound" the habeas court cannot conclude that the state court's finding that there was no

16   discrimination was objectively unreasonable.")

17            Under the standards addressed above which are binding on this court, petitioner is

18   not entitled to federal habeas relief on his Batson claim as to prospective juror J.W.

19        B.  Evidence of Prior Domestic Violence

20            Petitioner contends that the admission of three hearsay statements made by the

21   victim to responding police officers describing petitioner's prior acts of domestic violence,

22   violated his Sixth Amendment right to confront the witnesses against him.  (Pet. at 9.)  The trial

23   court admitted these statements pursuant to California Evidence Code § 1370, which provides for

24   the admission of hearsay statements by an unavailable witness under certain delineated

25   /////

26   /////

circumstances.[7]  On March 6, 1996 and June 16, 1998, the victim recounted petitioner's violent

acts to police officers dispatched to her residence in response to domestic violence calls.  (RT

203-210, 216-224.)  On December 28, 1996, the victim telephoned the police department to state

that she was not a "missing person" as petitioner had reported to police, but instead had fled her

apartment because she "feared for her life" due to petitioner's threats and violent behavior.  (RT

at 255-57.)  For the reasons discussed below, the state court decision rejecting petitioner's claims

of constitutional error in the admission of these statements into evidence at trial was neither

contrary to nor an unreasonable application of federal law.

1. State Court Decision

In the last reasoned decision to address petitioner's challenges to this testimonial

evidence, the California Court of Appeal reasoned as follows:

> At the time of defendant's trial, Ohio v. Roberts (1980) 448 U.S.
> 56 (hereafter Roberts ) held that the Sixth Amendment of the
> United States Constitution did not bar admission of a statement of
> an unavailable witness against a criminal defendant if the statement
> was admissible under state law, and bore sufficient " 'indicia of
> reliability.' " (Id. at p. 66.)
>
> Accordingly, over defendant's objection, the trial court here
> allowed, pursuant to Evidence Code section 1370, the introduction
> into evidence of statements the victim made to police officers
> about three prior acts of domestic violence by defendant.  Evidence
> Code section 1370 establishes a hearsay exception for out-of-court
> statements made to law enforcement officials, among others, by the
> victims of assault or of threats of assault if the declarant is

---

[7]  Specifically, California Evidence Code § 1370 states in pertinent part:

(a) Evidence of a statement by a declarant is not made inadmissible by the hearsay
rule if all of the following conditions are met: (1) The statement purports to
narrate, describe, or explain the infliction or threat of physical injury upon the
declarant. (2) The declarant is unavailable as a witness pursuant to section 240.
(3) The statement was made at or near the time of the infliction or threat of
physical injury.  Evidence of statements made more than five years before the
filing of the current action or proceeding shall be inadmissible under this section.
(4) The statement was made under circumstances that would indicate its
trustworthiness.  (5) The statement was made in writing, was electronically
recorded, or made to a physician, nurse, paramedic, or to a law enforcement
official.

"unavailable" and the statements are "trustworthy." FN4 ( People v. Hernandez (1999) 71 Cal.App.4th 417.)

FN4. [Omitted.]

After defendant's trial, the United States Supreme Court held the admission of "testimonial" hearsay statements by an unavailable declarant violates the confrontation clause of the Sixth Amendment unless defendant had an opportunity to cross-examine the declarant. (Crawford v. Washington (2004) 541 U.S. 36, 60-63, 68-69 (hereafter Crawford), overruling Roberts, supra, 448 U.S. 56.)

If, however, the statement is "nontestimonial," the rules of evidence apply, and it is not barred by the Sixth Amendment. "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . ." ( Crawford, supra, 541 U.S. at p. 68.)  Hence, state courts may consider "reliability factors beyond prior opportunity for cross-examination when the hearsay statement at issue was not testimonial. [Citation.]" ( Id. at p. 57.)

Crawford did not define the term "testimonial" and, instead, gave examples, such as (1) grand jury testimony, (2) prior testimony at trial testimony, (3) ex parte testimony at a preliminary hearing, and (4) statements to law enforcement officers in the course of interrogations. (Id. at pp. 51-52, 68.)

Relying on Crawford, defendant contends that because he did not have the opportunity to cross-examine the victim, her statements to the police regarding incidents of domestic violence on March 6, 1996, December 28, 1996, and June 16, 1998, should not have been introduced into evidence and, thus, defendant's convictions must be reversed.

We have awaited, and now received, further guidance from the United States Supreme Court on this issue.

In Davis v. Washington (2006) --- U.S. ---- [165 L.Ed.2d 224], the Supreme Court determined "when statements made to law enforcement personnel during a 911 call or at a crime scene are 'testimonial' and thus subject to the requirements of the Sixth Amendment's Confrontation Clause." ( Id. at p. 224.)  The court held: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." ( Id. at p. 224.)

29

For example, a "911 call" "and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establish or prov[e]' some past fact, but to describe current circumstances requiring police assistance"; consequently statements made during the 911 call and interrogation conducted in connection with the call are generally deemed to be nontestimonial. (Davis v. Washington, supra, --- U.S. at p. ---- [165 L.Ed.2d at p. 240].)  However, "[t]his is not to say that a conversation which begins as an interrogation to determine the need for emergency assistance cannot . . . 'evolve into testimonial statements,' . . . once that purpose has been achieved ." (Id. at p. 224 [165 L.Ed.2d at p. 241].)

When, on the other hand, there is no emergency in progress, and the officer is "not seeking to determine . . . 'what is happening,' but rather 'what happened,' " the statements are testimonial because they are a product of "an investigation into possibly criminal past conduct . . . ." (Davis v. Washington, supra, --- U.S. at p. ---- [165 L.Ed.2d at p. 242].)  This does not mean, however, "that no questions at the scene will yield nontestimonial answers"; for example, with regard to "domestic disputes," " '[o]fficers called to investigate . . . need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim.' [Citation.]  Such exigencies may often mean that 'initial inquiries' produce nontestimonial statements.  But . . . where [the] statements were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation," the statements become testimonial.  (Id. at p. 224 [165 L.Ed.2d at p. 243].)

Nevertheless, when the declarant does not testify because the defendant has procured the declarant's silence, "the Sixth Amendment does not require courts to acquiesce."  (Davis v. Washington, supra, --- U.S. at p. ---- [165 L.Ed.2d at p. 244].)  Thus, "when defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims," " 'the rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds.' [Citation.]  That is, one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." (Id. at p. 224 [165 L .Ed.2d at p. 244].)

Here, there is no question that defendant procured the victim's unavailability as a witness subject to cross-examination because he murdered her.  Hence, defendant has forfeited his ability to raise a Crawford challenge to the victim's statements to officers concerning prior domestic violence by defendant.

In any event, it appears the victim's statements to officers about defendant's acts of domestic violence against her on March 6,

/////

1996, and June 16, 1998, were nontestimonial and, thus, not subject to a Crawford challenge.

On March 6, 1996, Officer Falcon was dispatched to the victim's residence in response to a domestic violence call. The victim, who was obviously injured with swelling on her arm and leg, recounted that defendant had hit her, kicked her, threatened to kill her, and punched a hole in the wall after she told him that she wanted to end their relationship.  After struggling to get away from defendant, the victim called the police "to report what was going on."  The victim's call and statements to the responding officer were a quintessential "cry for help" describing current circumstances requiring police assistance; hence, they were nontestimonial. (Davis v. Washington, supra, --- U.S. at p. ---- [165 L.Ed.2d at p. 243].)

So, too, were the victim's statements on June 16, 1998, when Officer Chernow responded to a domestic violence call.  Stating she was afraid that defendant was going to kill her, the victim described how he assaulted her the night before after accusing her of "cheating on him" by going "out with another guy."  After then leaving the apartment, defendant returned late at night grabbed the victim and pushed her onto the bed.  Saying he was going to "fuck her up," defendant grabbed a belt, wrapped it around her neck, and pulled it so tight she could not breathe until the belt eventually broke.  Again, the victim's statements were a call for help to deal with a situation that, although it occurred the night before, had left the victim in current fear for her life.  She was seeking the officer's help not to establish or prove past events potentially relevant to later criminal prosecution, but to enable officers to immediately end a violent situation that was threatening to her.  Hence, the statements were nontestimonial and not subject to a Crawford challenge.

The statements the victim made regarding defendant's acts of domestic violence on December 28, 1996, present a more difficult situation. The victim telephoned the police department to say that she was not "a missing person" as defendant had reported to officers; rather, she had fled because she "feared for her life" after defendant threatened to kill her and slashed furniture in the apartment because he was angry with her.

Even if these statements were testimonial, we are satisfied beyond a reasonable doubt that defendant was not prejudiced by their introduction into evidence.

The victim's statements were not necessary to establish that defendant killed her; defendant conceded he did so.  The sole issue was whether the killing was murder or manslaughter. Defendant argues, "Obviously, the instances of prior domestic violence were crucial to this determination," and "the multiplicity of domestic

violence instances weighed heavily against a finding that a sudden heat of passion arose" when defendant killed the victim.  Thus, in defendant's view, the evidence made a significant contribution to the murder verdict such that the error is not harmless beyond a reasonable doubt.  We disagree.

The victim's sisters, Sheila and Shawn, testified about another act of domestic violence by defendant in 1998, when he broke the rental car window and punched the victim in the mouth.  They also disclosed that defendant had made numerous murderous threats to the victim. Their testimony was not inadmissible under Crawford.  Furthermore, the fact that defendant had a prior conviction for domestic violence for choking the victim with a belt in June 1998 was admissible pursuant to Evidence Code section 1109, without violating defendant's confrontation rights.  This properly admissible evidence lessened any prejudice that was occasioned by introduction of the victim's statements.

Moreover, the evidence against defendant was strong, if not overwhelming, and the evidence of a heat of passion killing was weak.  On the day of the killing, defendant stated that he was "sick of this B[itch]," referring to the victim, and that "he was going to do something real bad" to the next person with whom he had a confrontation and "it wasn't going to be nice."  Thereafter, he killed the victim in the same manner that he knew her mother had been killed, by stabbing her and severing her jugular vein.

Defendant's testimony was the only evidence supporting his heat of passion defense, but his credibility was impeached by his prior felony convictions.  Despite his claim that the victim pulled a knife on him, which he then grabbed by the blade, defendant did not have any cuts to the palm of his hands.  And Shawnetta, who was present in the apartment when her sister was killed, did not hear any yelling, screaming, or loud noises that night - which undermines defendant's assertion that the killing occurred in the heat of passion during an argument.  In fact, one would expect a woman being brutally stabbed to resist quite strenuously and noisily if she was awake during the attack.

Unquestionably, the jury rejected defendant's heat of passion defense because it was implausible, not because of the evidence of multiple prior acts of domestic violence.  Thus, the admission of the victim's statements was harmless beyond a reasonable doubt.

(Opinion I at 32-40) (emphasis added).

    2. Legal Standard

    The Sixth Amendment provides that a criminal defendant has the right to confront

the witnesses against him.  U.S. Const. amend. VI; Crawford v. Washington, 541 U.S. 36, 124

1   (2004); Maryland v. Craig, 497 U.S. 836, 845-46 (1990) (explaining that "[t]he central concern of

2   the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant

3   by subjecting it to rigorous testing in the context of an adversar[ial] proceeding before the trier of

4   fact").  This is a fundamental right, which applies to all out-of-court testimonial statements

5   ("testimonial hearsay") offered for the truth of the matter asserted.  Crawford, 541 U.S. at 68.

6   Testimonial hearsay is inadmissible, unless (1) the witness is unavailable, and (2) the criminal

7   defendant had an opportunity to cross-examine the declarant at the action or proceeding where the

8   testimony took place.  Crawford, 541 U.S. at 53-54; Jackson v. Brown, 513 F.3d 1057, 1082-83

9   (9th Cir. 2008).

10          In Crawford, the Supreme Court declined "to spell out a comprehensive definition

11   of 'testimonial.'"  541 U.S. at 68 & n. 10.  However, the court did describe three "formulations of

12   [the] core class of testimonial statements."  Id. at 51-52.  The first formulation was described as

13   "ex parte in-court testimony or its functional equivalent-that is, material such as affidavits,

14   custodial examinations, prior testimony that the defendant was unable to cross-examine or similar

15   pretrial statements that declarants would reasonably expect to be used prosecutorially."  Id. at 51.

16   The second formulation was described as "extrajudicial statements . . . contained in formalized

17   testimonial materials, such as affidavits, depositions, prior testimony, or confessions."  Id. at

18   51-52 (quoting White v. Illinois, 502 U.S. 346 (1992)).  The third formulation described

19   statements that were "made under circumstances which would lead an objective witness

20   reasonably to believe that the statement would be available for use at a later trial."  Id. at 52.

21          In Davis v. Washington, 547 U.S. 813, 821-33 (2006), a case involving a call

22   during an ongoing emergency to a 911 operator (deemed a police agent), the Supreme Court

23   elaborated on the holding in Crawford, exploring the parameters of statements which were

24   "testimonial" in nature.  The Supreme Court stated as follows:

25          Statements are nontestimonial when made in the course of police
            interrogation under circumstances objectively indicating that the
26          primary purpose of the interrogation is to enable police assistance to

33

Case 2:09-cv-01396-LKK-DAD   Document 24   Filed 06/27/11   Page 34 of 43

1   meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate th
emergency, and that the primary purpose of the interrogation is to establish or prove past events
2   potentially relevant to later criminal prosecution.

3   Id. at 822.  The Supreme Court further held that a criminal defendant who obtains the absence of a

4   witness by wrongdoing forfeits the constitutional right to confrontation.  Id. at 833.  See also

5   Crawford, 541 U.S. at 62.  However, in Giles v. California, 554 U.S. 353, 367 (2008), the

6   Supreme Court reversed the California Supreme Court, and held that the hearsay exception for

7   "forfeiture by wrongdoing" exists only for "[a] statement offered against a party that has engaged

8   or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the

9   declarant as a witness."  In other words, "the exception applies only if the defendant has in mind

10  the particular purpose of making the witness unavailable."[8]  Id.

11          Confrontation Clause violations are subject to harmless error review.  Winzer v.

12  Hall, 494 F.3d 1192, 1201 (9th Cir.2007) ("Violation of the Confrontation Clause is trial error

13  subject to harmless-error analysis . . . because its effect can be 'quantitatively assessed in the

14  context of other evidence presented' to the jury."); United States v. Nielsen, 371 F.3d 574, 581

15  (9th Cir. 2004).  Habeas corpus relief may not be granted based on a Confrontation Clause

16  violation unless the admission of the offending evidence had a substantial and injurious effect or

17

18          [8]  The Supreme Court has specifically addressed how the "forfeiture by wrongdoing"
doctrine may be applied in the domestic violence context, stating as follows:  "Acts of domestic
19  violence often are intended to dissuade a victim from resorting to outside help, and include
conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions.
20  Where such an abusive relationship culminates in murder, the evidence may support a finding
that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to
21  the authorities or cooperating with a criminal prosecution – rendering her prior statements
admissible under the forfeiture doctrine.  Earlier abuse, or threats of abuse, intended to dissuade
22  the victim from resorting to outside help would be highly relevant to this inquiry, as would
evidence of ongoing criminal proceedings at which the victim would have been expected to
23  testify."  Giles v. California, 554 U.S. 353, 377 (2008).  Here, because petitioner's trial took
place prior to the Supreme Court's decision in Giles, no findings were made as to whether any of
24  petitioner's described prior acts of domestic violence were intended to prevent the victim from
cooperating with police or testifying against petitioner.  Had such findings been made, they may
25  have triggered the application of the "domestic violence exception" to the rule stated in Giles.
However, absent such findings, this court may not speculate as to petitioner's intent and thus
26  finds no basis for application of the exception under the Giles rule in this case.

1  influence in determining the jury's verdict, and only if the petitioner can establish actual

2  prejudice.  Hernandez v. Small, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing Brecht v.

3  Abrahamson, 507 U.S. 619, 637 (1993)).

4          3.  Discussion

5          As a preliminary matter, to the extent petitioner is challenging the trial court's

6  admission of the victim's statements to police officers under California Evidence Code § 1370,

7  his claim is not cognizable in this federal habeas action.  Estelle, 502 U.S. at 67-68.  A state

8  court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal

9  law, either by infringing upon a specific federal constitutional or statutory provision or by

10  depriving the defendant of the fundamentally fair trial guaranteed by due process.  See Pulley v.

11  Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991).

12  Accordingly, a federal court cannot disturb a state court's decision to admit evidence on due

13  process grounds unless the admission of the evidence was "arbitrary or so prejudicial that it

14  rendered the trial fundamentally unfair."  Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995).

15  See also Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1986).  In addition, in order to obtain

16  habeas relief on the basis of evidentiary error, petitioner must show that the error was one of

17  constitutional dimension and that it was not harmless under Brecht v. Abrahamson, 507 U.S. 619

18  (1993).  Thus, in order to grant relief, the habeas court must find that the error had "'a substantial

19  and injurious effect' on the verdict."  Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001)

20  (quoting Brecht, 507 U.S. at 623).

21          Moreover, with respect to the admission of the victim's statements to police

22  officers on March 6, 1996 and June 16, 1998, the undersigned finds that the state court properly

23  applied clearly established federal law as set forth in the decisions in Crawford and Davis.  On

24  both those occasions, the victim sought police assistance in ending a violent rampage during

25  which she was hit, kicked, and threatened with death (March 6, 1996) or strangled with a belt

26  (June 16, 1998).  Because the victim described petitioner's actions to police in the context of these

then-ongoing emergencies, the state courts reasonably concluded that such "cries for help" were non-testimonial under the standards established by the United States Supreme Court.  See Davis, 547 U.S. at 822.

As to the victim's December 28, 1996 statements to police regarding petitioner's past violent acts, the undersigned finds the state appellate court's conclusion (that, even if these statements were testimonial in nature, their admission was harmless) to be reasonable.  Substantial evidence indicated that petitioner had a history of domestic violence toward the victim, including testimony by the victim's sister Sheila Yates that petitioner hit the victim in the mouth and threatened her with violence (RT at 309-311, 324); testimony by the victim's sister Shawn Yates that petitioner broke the victim's car window during an argument, hit her in the mouth, and made death threats against her (RT at 397-398, 401); petitioner's admitted prior conviction for domestic violence (RT at 683); and the victim's statements to police in March 1996 and June 1998.  Indeed, at trial the defense did not dispute that petitioner had killed the victim.  As the California Court of Appeal reasoned, this properly admitted evidence lessened any prejudicial effect stemming from the admission of the victim's statements to police on December 28, 1996.

The record also supports the state court's determination that, regardless of any particular piece of evidence concerning petitioner's history of domestic violence, his heat of passion defense was weak and implausible, and the jury could have rejected it on that basis.  (See RT at 1391-1406) (summarizing evidence of petitioner's lack of credibility and his intent to kill).  Because the state court reasonably determined that any error in admitting the victim's December 28, 1996 statement to police into evidence was harmless, petitioner is not entitled to federal habeas relief with respect to this claim.

C.  Ineffective Assistance of Counsel

Petitioner also claims that the erroneous admission into evidence of hearsay statements concerning his prior acts of domestic violence against the victim, as described above, had the effect of denying him his Sixth Amendment right to effective assistance of counsel.  In

1    this regard, petitioner argues that the admission of these statements affected his defense attorney's

2    advice to him and his own decision to testify.  (Pet. at 10.)

3           The California Court of Appeal rejected this argument, reasoning as follows:

4           Defendant argues the erroneous admission of the aforementioned
            uncharged evidence pursuant to Evidence Code section 1370
5           interfered with his right to the effective assistance of counsel.  This
            is so, he says, because the introduction of the evidence of his
6           uncharged conduct affected his attorney's advice concerning
            whether defendant should testify.
7
            The contention fails because it is based on a flawed premise.  As we
8           explained in part V, ante, the trial court did not err in allowing the
            prosecutor to introduce into evidence the victim's statements about
9           defendant's prior acts of domestic violence.

10   (Opinion I at 40.)

11          Similarly, this court has concluded that the admission into evidence of the victim's

12   statements to police concerning petitioner's prior acts of violence did not violate petitioner's Sixth

13   Amendment right to confront witnesses.  Nor can the admission of these statements support an

14   ineffective assistance claim under the deferential AEDPA standard.

15          To demonstrate ineffective assistance of counsel under AEDPA, a petitioner first

16   must show that counsel's performance fell below an objective standard of reasonableness.

17   Strickland v. Washington, 466 U.S. 668, 688 (1984).  The reviewing court must "strongly

18   presume that counsel's conduct was within the wide range of reasonable assistance, and that he

19   exercised acceptable professional judgment in all significant decisions made."  Hughes v. Borg,

20   898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689).  As the Supreme Court

21   has recently observed: "When § 2254(d) applies, the question is not whether counsel's actions

22   were reasonable.  The question is whether there is any reasonable argument that counsel satisfied

23   Strickland's deferential standard."  Harrington,131 S.Ct. at 788.

24          Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

25   693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

26   unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  Here,

1  petitioner has met neither step of the Strickland test.  It is not clear from petitioner's allegations

2  what unreasonable conduct, if any, his attorney purportedly engaged in with respect to the

3  admission into evidence of  the victim's statements to police.  Moreover, while admission of the

4  victim's March 1996 and June 1998 statements may well have had a negative effect on the

5  defense, petitioner has not alleged any prejudice stemming from his attorney's conduct.

6         Therefore, petitioner is not entitled to federal habeas relief  with respect to his

7  ineffective assistance of trial counsel claim.

8     D.  Prior Offense Jury Instructions

9         Lastly, petitioner claims that the trial court erred in instructing the jurors at his trial

10  that prior offenses need only be proved by a preponderance of evidence.  Petitioner argues that

11  such instruction likely confused the jury regarding the prosecution's burden of proof with respect

12  to the murder charge.  Specifically, petitioner takes issue with the trial court's use of CALJIC Nos.

13  2.50.02 and 2.50.1.  (Pet. at 11; see Clerk's Transcript on Appeal (hereinafter "CT") at 514-515.)

14     1.  State Court Opinion

15  The California Court of Appeal rejected this argument, reasoning as follows:

16     Due to the introduction of defendant's prior acts of domestic
       violence against the victim (Evid. Code, § 1109), the trial court
17     instructed the jurors with CALJIC No. 2.50.02 as follows:  "If you
       find that the defendant committed . . . a prior offense involving
18     domestic violence, you may, but are not required to, infer that the
       defendant had a disposition to commit other offenses involving
19     domestic violence. [¶]  If you find that the defendant had this
       disposition, you may, but are not required to, infer that he was likely
20     to commit and did commit the crimes of which he is accused.  [¶]
       However, if you find by a preponderance of the evidence that the
21     defendant committed a prior crime or crimes involving domestic
       violence, that is not sufficient by itself to prove beyond a reasonable
22     doubt that he committed the charged offenses.  [¶]  Thus, the weight
       and significance of any prior abuse that you may find is for you to
23     decide.  Unless you are otherwise instructed, you must not consider
       this evidence for any other purpose."
24
       The court then instructed the jurors with CALJIC No. 2.50.1 as
25     follows:  "Within the meaning of the preceding instruction, the
       prosecution has the burden [of] proving by a preponderance of
26     evidence that the defendant committed crimes other than those for

1   which he is on trial. [¶]  You must not consider this evidence for any
2   other purpose unless you find by a preponderance of evidence that a
    defendant committed the other crimes."

3   Defendant contends there is a reasonable likelihood that these
    instructions misled the jury into premising defendant's guilt on only
4   a preponderance of the evidence, rather than on proof beyond a
    reasonable doubt. This is so, defendant argues, because the
5   instructions indicate that subsidiary facts need be proved only by a
    preponderance of the evidence, which conflicts with the directive of
6   CALJIC No. 2.01 that any piece of evidence deemed essential to the
    overall determination of proof beyond a reasonable doubt must itself
7   be proved beyond a reasonable doubt. FN3

8           FN3.  As given to the jury, CALJIC No. 2.01 stated:
            "[A] finding of guilt as to any crime may not be based
9           on circumstantial . . . evidence unless the proved
            circumstances are not only, one, consistent with the
10          theory that the defendant is guilty of the crime, but
            two, cannot be reconciled with any other rational
11          conclusion. [¶] Further, each fact which is essential to
            complete a set of circumstances necessary to establish
12          the defendant's guilt must be proved beyond a
            reasonable doubt. [¶]  In other words, before an
13          inference essential to establish guilt may be found to
            have been proved beyond a reasonable doubt, each
14          fact or circumstance on which the inference
            necessarily rests must be proved beyond a reasonable
15          doubt."

16  Thus, defendant argues the instructions were unconstitutional, in
    effect, because "a finding of malice aforethought might well depend
17  on a direct chain of inference from the existence vel non of any one
    of the alleged incidents of uncharged domestic violence."

18
    In People v. Pescador (2004) 119 Cal.App.4th 252, this court
19  rejected such an attack on CALJIC No. 2.50.02.  (Id. at pp. 258-262.)
    For the reasons stated in that decision, we reject defendant's like
20  attack on the instruction.  (See also People v. Reliford (2003) 29
    Cal.4th 1007, 1012-1016; People v. Jeffries (2000) 83 Cal.App.4th
21  15, 23-24.)

22  (Opinion I at 24-26; emphasis added.)

23          In the case relied upon by the state appellate court in rejecting petitioner's jury

24  instruction claim, People v. Pescador, the court had reasoned as follows:

25  /////

26          Defendant . . . asserts CALJIC No. 2.50.02 unconstitutionally

undermines the presumption of innocence and the requirement of proof beyond a reasonable doubt.  According to defendant, the instruction allows the jury to infer he committed the crime based solely on prior acts of domestic violence, negating the presumption of innocence.

Preliminarily, we note the California Supreme Court approved a similar instruction, which addresses admission of evidence of a defendant's prior uncharged sexual offenses, in People v. Reliford (2003) 29 Cal.4th 1007, 130 Cal. Rptr. 2d 254, 62 P.3d 601 (Reliford ) . . . .

In Reliford, the defendant criticized the instruction for failing to inform jurors that the inference they might draw from prior sexual offenses was simply one item to consider along with all other evidence in determining beyond a reasonable doubt that the defendant had been proved guilty beyond a reasonable doubt of the charged crime.  ( Reliford, supra, 29 Cal.4th at p. 1015, 130 Cal. Rptr.2d 254, 62 P.3d 601.)  The court rejected the challenge, finding: "By telling jurors that evidence of prior offenses is insufficient to prove defendant's guilt of the charged offenses beyond a reasonable doubt, jurors necessarily understand that they must consider all the other evidence before convicting defendant." ( Ibid.)

CALJIC No. 2.50.02 contains a similar admonition that defendant's commission of prior crimes "is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged offense." In addition, the court instructed the jury with CALJIC No. 2.90, regarding the presumption of innocence and the burden of proof, and CALJIC No. 1.01, instructing the jury to view the instructions as a whole.  We presume the jury followed the court's instructions. (People v. Holt (1997) 15 Cal.4th 619, 662, 63 Cal. Rptr.2d 782, 937 P.2d 213.)

Finally, defendant asserts CALJIC No. 2.50.02 together with CALJIC No. 2.50.2 permits the jury to infer guilt based on prior acts proven by a preponderance of the evidence, undermining the beyond a reasonable doubt standard to be applied to the charged offense . . . .

[I]n Reliford, the Supreme Court faced a similar challenge to CALJIC No. 2.50.01.  The court turned back the challenge: "We do not find it reasonably likely a jury could interpret the instructions to authorize conviction of the charged offenses based on a lowered standard of proof.  Nothing in the instructions authorized the jury to use the preponderance-of-the-evidence standard for anything other than the preliminary determination whether defendant committed a prior sexual offense . . . .  The instructions instead explained that, in all other respects, the People had the burden of proving defendant guilty 'beyond a reasonable doubt.'  [Citations.]  Any other reading would have rendered the reference to reasonable doubt a nullity." (Reliford, supra, 29 Cal.4th at p. 1016, 130 Cal. Rptr.2d 254, 62 P.3d

1   601.)

2   Here, the court also instructed the jury the prosecution bore the
    burden of proving defendant guilty beyond a reasonable doubt.
3   (CALJIC No. 2.90.)  We find no error in the court's instructions.

4   People v. Pescador, 119 Cal. App. 4th 252, 259-262 (2004).

5       2.  Legal Standard

6       In state criminal trials, the Due Process Clause of the Fourteenth Amendment

7   "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact

8   necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364

9   (1970).  "[T]he Constitution does not require that any particular form of words be used in advising

10  the jury of the government's burden of proof.  Rather, 'taken as a whole, the instructions [must]

11  correctly conve[y] the concept of reasonable doubt to the jury."  Victor v. Nebraska, 511 U.S. 1, 5

12  (1994) (quoting Holland v. United States, 348 U.S. 121, 140 (1954) (internal citations omitted)).

13  In evaluating the constitutionality of a jury charge such as this one, the court must determined

14  "whether there is a reasonable likelihood that the jury understood the instructions to allow

15  conviction based on proof insufficient to meet the Winship standard."  Id. at 6.  See also Lisenbee

16  v. Henry, 166 F.3d 997, 999 (9th Cir. 1999); Ramirez v. Hatcher, 136 F.3d 1209, 1211 (9th Cir.

17  1998).

18      3.  Discussion

19      Here, petitioner has failed to demonstrate a reasonable likelihood that the jury at his

20  trial understood the instructions given to suggest a standard of proof lower than due process

21  requires or to allow his conviction based on factors other than the prosecution's proof.  Reviewing

22  the instructions in their entirety, this court finds no reasonable likelihood that the jury

23  misunderstood the government's burden of proving every element of the charged crimes beyond a

24  reasonable doubt.  Petitioner's jury was instructed that "[a] defendant in a criminal case is

25  presumed to be innocent," that the prosecution had the burden of proving every element of the

26

1  crime beyond a reasonable doubt, and that reasonable doubt is "not a mere possible doubt . . . [but]

2  that state of the case which, after the entire comparison and consideration of all the evidence,

3  leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction

4  of the truth of the charge." (CT at 511, 518.) In giving CALJIC No. 2.50.02, the trial court further

5  instructed the jury that "if you find by a preponderance of the evidence that the defendant

6  committed a prior crime or crimes involving domestic violence, that is not sufficient by itself to

7  prove that he committed the charged offenses." (CT at 515.) The jury instructions at petitioner's

8  trial therefore correctly conveyed the prosecutor's burden of proof and did not in any way suggest

9  that a mere preponderance of the evidence would suffice to convict petitioner of murder.

10        The state appellate court's rejection of petitioner's due process challenge to these

11  jury instructions given at his trial was not an unreasonable application of federal law. Petitioner is

12  therefore not entitled to federal habeas relief on this claim.

13                                            CONCLUSION

14        Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

15  writ of habeas corpus be denied.

16        These findings and recommendations are submitted to the United States District

17  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty-one

18  days after being served with these findings and recommendations, any party may file written

19  objections with the court and serve a copy on all parties. Such a document should be captioned

20  "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections

21  shall be served and filed within fourteen days after service of the objections. Failure to file

22  objections within the specified time may waive the right to appeal the District Court's order.

23  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir.

24  1991). In any objections he elects to file petitioner may address whether a certificate of

25  appealability should issue in the event he elects to file an appeal from the judgment in this case.

26  /////

1  <u>See</u> Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a

2  certificate of appealability when it enters a final order adverse to the applicant).

3  DATED: June 23, 2011.

4

5  _____

6  DALE A. DROZD
   UNITED STATES MAGISTRATE JUDGE

7

8  DAD:3
   john1396.hc

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26